**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

David R. Proverb

v.                                              Civil No. 08-cv-431-PB

James O'Mara, Superintendent,
Hillsborough County Department
of Corrections, et al.[1]

**REPORT AND RECOMMENDATION**

Before the Court is David Proverb's complaint (document nos.

1, 6, 7 & 11)[2], filed pursuant to 42 U.S.C. § 1983, alleging that

---

[1] In addition to O'Mara, Proverb names the following employees of the Hillsborough County Department of Corrections as defendants to this action: Capt. William Scurry, Sgt. J. Duclose, Capt. Mark Cusson, Capt. Bonnie Ives, Capt. Gilfford Hisco, Lt. Riley (first name unknown ("FNU")), Sgt. FNU Pinciaro, Bill Raymond, Christine (last name unknown ("LNU")), FNU Barber, Dr. FNU Harris, Sgt. FNU Gordon, Corrections Officer ("C.O.") FNU Adams, C.O. FNU Lucas, C.O. FNU Revis, C.O. FNU Rosado, C.O. FNU Archenbault, C.O. FNU Ellis, C.O. FNU Marinowski, C.O. FNU Rodriguez, C.O. FNU Moloney, Jan LNU, Field Training Officer ("FTO") FNU Antillis, FTO FNU Granville, Sgt. FNU Barnes, Sgt. FNU Potter, C.O. FNU Rodgers, C.O. FNU Gosslin, C.O. FNU Thomas, C.O. FNU Sloane, C.O. FNU Utzilano, Sgt. FNU Brown, C.O. FNU Bowers, C.O. FNU Goldmann, C.O. FNU Bass, and several John Doe C.O.s.

[2] Proverb initially filed a complaint (document no. 1) on October 20, 2008. He filed attachments to that complaint on October 30, 2008. On January 9, 2009, Proverb filed two motions to amend his complaint (document nos. 6 & 7) and an addendum to his complaint (document no. 11). I grant the motions to amend

the defendants have violated his rights under the United States
Constitution during his incarceration at the Hillsborough County
Department of Corrections ("HCDOC").  The matter is before me for
preliminary review to determine, among other things, whether the
complaint states any claim upon which relief might be granted.
See 28 U.S.C. § 1915A(a); United States District Court District
of New Hampshire Local Rule ("LR") 4.3(d)(2).

        Proverb has also filed several motions for discovery,
seeking recordings of phone calls made from the HCDOC, HCDOC
surveillance videos, and investigative documents and reports in
the possession of the HCDOC or the Manchester, New Hampshire
Police Department (document nos. 8-10).  Because I find that
these motions are premature, they are denied without prejudice to
being renewed during discovery in this case, if necessary.

                        Standard of Review

        Under this Court's local rules, when an incarcerated
plaintiff commences an action pro se and in forma pauperis, the
magistrate judge is directed to conduct a preliminary review.  LR
4.3(d)(2).  In conducting the preliminary review, the Court
construes pro se pleadings liberally, however inartfully pleaded.

and will consider all of the documents, in the aggregate, to
constitute the complaint in this action.

                                2

See <u>Erickson v. Pardus</u>, 551 U.S. 89, ___, 127 S. Ct. 2197, 2200
(2007) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and
<u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972) to construe pro se
pleadings liberally in favor of the pro se party). "The policy
behind affording pro se plaintiffs liberal interpretation is that
if they present sufficient facts, the court may intuit the
correct cause of action, even if it was imperfectly pled." <u>See</u>
<u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (noting that
courts may construe pro se pleadings so as to avoid
inappropriately stringent rules and unnecessary dismissals of
claims); <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997).
All of the factual assertions made by a pro se plaintiff and
inferences reasonably drawn therefrom must be accepted as true.
<u>See id.</u>  This review ensures that pro se pleadings are given fair
and meaningful consideration.

## Background

### Facts Regarding Conditions of Confinement

David Proverb is a pretrial detainee who has been
incarcerated at the HCDOC since January of 2007.  Proverb has, at
least since February of 2007, consistently been classified as a
protective custody ("P.C.") inmate, meaning that he is separated

3

from the general population of inmates and housed with other P.C. inmates for his own safety.[3]

Proverb alleges that he was housed, with another inmate, in an eight foot by twelve foot cell for twenty-two hours a day, seven days a week. Also in this space was a double bunk, a desk, shelving, and a toilet/sink unit. Proverb claims that the size of the cell cannot adequately accommodate two inmates.

Further, Proverb states that at one point his cell had a broken cold water valve stem. As a result, for eight days, water constantly streamed from the sink onto his cell floor, during which the broken valve stem was not fixed, despite the officers on the unit claiming they had submitted a repair request to fix it. Proverb claims to have suffered severe sleep deprivation from the noise of the streaming water, causing depression and nausea. After eight days, Proverb was moved to a different cell, after he had sent a letter complaining about the condition of his cell to HCDOC Superintendent James O'Mara.

Proverb further complains that he was subjected to sleep deprivation while housed in Unit 1C because the lights and

---

[3]Although Proverb does not directly state why he was classified as a P.C. inmate, it appears that it was because his charges involve the sexual assault of a minor, a fact which, if known to other inmates, places him at risk of harm.

4

television stayed on in the dayroom until 4:00 a.m.

Additionally, doors were slammed at all hours, and the volume on the officers' radios was kept all the way up throughout the night. As a result, Proverb complains he received only one to two hours of sleep per night, and another three to four hours during the day. Although Proverb complained to C.O.s Rodgers, Gosslin, Thomas, Sloane, Utzilino, Sgt. Barnes, Sgt. Brown, O'Mara, and others, the HCDOC officials were not responsive to his concerns.

Proverb states that while he was housed on a multi-classification unit, the P.C. inmates on that unit were locked down twenty-two hours a day, as the officers had to accommodate out-of-cell time for a number of different classifications of inmates who could not share out-of-cell time with the P.C. inmates for the safety of the P.C. inmates. Due to excessive lockdown time, Proverb asserts broadly that P.C. inmates on the unit were denied reasonable access to telephone calls, educational programs, recreation, exercise, religious services, hygiene, medical care, mental health treatment, and visitors by Bill Raymond, Capt. Bonnie Ives, O'Mara, Capt. William Scurry, Capt. Mark Cusson, and Capt. Gilfford Hisco. Proverb asserts

that P.C. inmates should be kept in an entirely separate housing
area from other classifications of inmates, preferably in a
separate building.  In that way, P.C. pretrial detainees would
not have to be subjected to restrictive and punitive conditions
of confinement in order to protect their safety.  Proverb asserts
that although he did not, as a P.C. inmate, pose a security risk,
he was denied the rights and privileges afforded to pretrial
inmates in general population as a result of his housing
assignment and classification.

    Proverb claims that his out-of-cell time often had to double
as his time for religious services, visits, law library,
educational programming, and hygiene maintenance, which deprived
him of access to telephones, and sometimes forced him to choose
between bible study, time in the law library, or a shower.
Proverb further asserts that his two daily one-hour out-of-cell
times were frequently interrupted or cut short by events at the
prison, such as lockdown drills, fire drills, pod meetings,
laundry, and mail call.

    Proverb complains that he was not given adequate access to
opportunities to exercise.  His cell, he claims, is too small to
do any meaningful exercise there.  Further, Proverb states that

                                6

he was afforded time in the gym no more than once weekly, and that then it was to play basketball, which he doesn't play, so he did not attend. The recreation yard, which provides an opportunity to exercise outdoors, is closed from October 15 to April 15 every year.

Proverb complains that he is denied access to any natural light. Although his cell has a window, it faces a nearby brick wall, which entirely blocks natural light from his cell. The closure of the recreation yard for six months a year, Proverb claims, entirely deprives him of natural light and fresh air during those months.

## Excessive Force, Verbal Abuse, Free Speech and Denial of Access to Grievance Procedures Claims

On January 9, 2007, Proverb was placed on "suicide watch" on Unit 1C by the HCDOC intake nurse who interviewed him upon his admission to the HCDOC. Proverb was escorted to his cell by Sgt. Pinciaro and C.O. Ellis. C.O.s Rodriguez and Adams, and three unnamed C.O.s, were waiting by his cell. Proverb was then strip searched inside the cell by Pinciaro, accompanied by three or four other C.O.s. Proverb claims that, during the strip search, he was verbally abused, berated, yelled at, and humiliated by several C.O.s. Once naked, Proverb was told to face the wall and

7

to keep his eyes straight ahead. When he did, the onslaught of verbal abuse intensified. One C.O. grabbed the back of Proverb's head and said "You think you've got muscles? You think you're big? I'll show you f---ing muscles. I'll hold you down you piece of s---." The C.O. holding his neck then slammed his head into the concrete wall six to twelve times, causing bruising, swelling, and lasting migraine headaches.

The strip search continued. Proverb was instructed to lift his genitalia. When he did, he was again verbally abused. C.O. Ellis told Proverb to face the wall again and lift his feet, one at a time, which he did. He was then ordered to squat, while facing the wall, and to cough. While trying to comply with this order, Proverb lost his balance and fell into the wall. As he did so, he turned his head to the side, to avoid hitting the front of his face. Because Proverb had turned to the side, a C.O. behind him said "I guess he doesn't know how to do what he's told to do." The other C.O.s started yelling things like "Teach the piece of s--- how we do things here," "Block the door," and "Let's welcome him to our world." Pinciaro then said "Give him a taste of what he's in for. Just don't f---ing leave any damn marks. We can't have any more accidents." Proverb was then

8

grabbed again, pulled up, slammed into the corner of the cell, and held there while he was punched several times in the back of the head, and kicked on the ankles in order to spread his legs apart. During these assaults, Proverb could hear the C.O.s standing in the background laughing. Proverb states that by this time he was sobbing and begging the officers to leave him alone. Proverb then was kicked in the back of the knee and fell to his knees. The officers picked Proverb up off the floor. Ellis punched Proverb in the kidneys, forcing Proverb to again drop to his knees. The C.O.s again pulled Proverb to his feet, while continually telling him to keep his nose on the wall and to face the wall. If his head moved, Proverb was punched in the head. The C.O.s also yelled at him for failing to follow directions when he fell to his knees without having been instructed to do so. Proverb was naked during this entire incident, and was only allowed to put on a safety smock after the officers had left his cell.

Proverb further alleges that during his time on Unit 1C, C.O. Archenbault twice stood by his cell door with two other C.O.s calling to Proverb and taunting him. Archenbault told

9

Proverb that he would make sure that Proverb didn't live long enough to make it to trial.

During his second week of incarceration at the HCDOC, after approximately ten days on suicide watch, Proverb states that Bill Raymond, the HCDOC director of classification, ordered that Proverb be housed in the maximum security Unit 2B. C.O. Rosado escorted Proverb to Unit 2B, holding Proverb's handcuffed wrists behind his back and, while doing so, pushed them up the center of Proverb's back, causing pain in his wrists and arms. Proverb politely asked Rosado to ease up on his arms, and Rosado told Proverb to "shut the f--- up" and pushed the handcuffs up harder so that Proverb had to walk on his tiptoes.

Proverb states that during the first week of September of 2007, he was again placed on suicide watch. During that week, Sgt. Gordon, FTO Granville, and FTO Antillis conducted a strip search of Proverb. During the strip search, Antillis, who is African-American, became infuriated when he noticed a confederate flag tattoo on Proverb's arm. While Proverb was naked, Antillis forcefully pushed Proverb's face into the cement cell wall and held it there for ten minutes, asking Proverb repeatedly if he was a racist, or if he hated African-American people. Proverb

10

answered Antillis, stating that he did not hate African-Americans and was not a racist. Antillis then told Proverb to say "I love black people." Proverb refused, telling Antillis that forcing him to voice that opinion violated his First Amendment free speech right. Antillis punched Proverb in the kidneys and continued to tell Proverb to say that he loved black people. Proverb continued to refuse and Antillis slammed his head into the wall. Gordon then told Proverb to say it in order to stop the beating, or else he would be taken to "the hole" where he would "pray to God [he] wished [he] said it" (sic). After ten minutes, Proverb relented and said that he loved black people. Antillis then forced him to repeat it several times, louder each time, until the entire unit could hear him.

The following day, Antillis and Sgt. Riley came onto Proverb's unit, taunted him, and left. That evening, Barnes, Riley, and FTO Potter went to Proverb's cell to answer Proverb's request for a form so that he could file a grievance about the previous day's incident. After a ten minute discussion, Riley grabbed Proverb's mouth, told him to "shut the f--- up," and told him that it would be in his best interest to write on his grievance form that he was recanting his allegations regarding

the incident. Riley advised Proverb that life at the HCDOC would worsen for him if he failed to recant his complaint. As a result of this threat, Proverb agreed to recant his grievance. One month later, however, Proverb requested a grievance form and renewed his grievance.

## Bible Study

In the second week of February of 2007, after leaving Unit 2B, Proverb was assigned to Unit 2A[4] at the HCDOC, the P.C. unit. At that time, he was afforded the opportunity to attend Christian bible study on Monday mornings, Tuesday evenings, and Thursday evenings. In September of 2007, however, Proverb's family was threatened by another inmate housed on Unit 2A, Ishmael Malave. As a result, Proverb submitted an "enemy slip" to HCDOC administration, naming Malave as an enemy, indicating that the two should be separated. During the first or second week of March 2008, Raymond moved Proverb to Unit 1C, a multi-classification unit including medical, administrative segregation, and P.C. inmates who require housing away from the other P.C. inmates.

---

[4]Proverb states that the regular P.C. unit is now 1A. For clarity, however, I will continue to refer to it as Unit 2A, as it is unclear when the location was changed.

12

Until he was moved to Unit 1C, Proverb was able to attend three weekly bible study sessions. Once transferred, Proverb requested to be allowed to again attend three weekly bible study sessions, but was not allowed to do so. Proverb states that for approximately six months, he made numerous requests for his previous bible study schedule, but he received no response. Finally, Proverb filed a grievance. Scurry responded to Proverb and advised him that he would have to choose one bible study class to attend in order for the HCDOC administration to keep him separated from Malave. Proverb chose to attend Tuesday evening bible study, as he preferred the method of teaching employed by the Tuesday evening teacher over that of those who taught the other classes. Scurry approved this arrangement.

On July 22, 2008, a Tuesday evening, Proverb and two other P.C. inmates housed on Unit 1C attended bible study. The following Tuesday, however, Proverb was denied bible study class because Scurry had failed to inform the staff on duty of his agreement with Proverb. When Proverb grieved being denied bible study class that day, Sgt. J. Duclose intervened to attempt an informal resolution of the situation. Duclose agreed that P.C. inmates in Unit 1C could attend bible study on Tuesday nights.

13

On August 19, 2008, Proverb was able to attend bible study. After that, Proverb was advised that Scurry had changed his mind, and would only allow the Unit 1C P.C. inmates to attend bible study on Thursday nights. Proverb grieved the alteration in schedule, but his grievance was determined to be unfounded.

Proverb states that as of October 12, 2008, P.C. inmates on Unit 1C are able to attend one bible study class a week, but that P.C. inmates on Unit 2A are still able to attend bible study classes three times a week. Further, Proverb states that if Malave chooses to attend a particular bible study class, that he is given preference, and Proverb is then not able to attend that class. Proverb asserts that he is essentially being punished with the denial of access to bible study classes for reporting the bad actions of Malave in order to protect himself, while Malave is free to attend frequent bible study.

## Unsanitary Conditions

On January 9, 2007, while Proverb was being assaulted by the officers, Pinciaro directed one of the C.O.s present to remove all of the toilet paper from Proverb's cell. Proverb was not provided with any toilet paper for a period of four days. Proverb states that during this time he was forced to clean

14

himself with his hand, and by squatting over the sink in his cell, which was his only water source for both washing and drinking. Proverb was not given any soap to use, and claims that he had to eat with fecal matter under his fingernails. Proverb also claims that while on suicide watch, he was not given a pillow or blanket, and was provided only with a "urine-spoiled" mattress. Proverb states that while he was housed in Unit 1C on suicide watch, officers allowed inmates to put urine-soaked wads of toilet paper under his cell door.

Later, in 2008, Proverb was housed on 1C, but not on suicide watch. Proverb states that, as Unit 1C is a multi-classification unit, the P.C. inmates there are locked down twenty-two hours a day. As a result, they are fed in their cells. Their meals trays are slid under the door, often by the foot of the officer or inmate delivering the meal. In addition, milk cartons are slid across the floor and often have to be washed before they are clean enough to drink from.

Proverb claims that during his confinement at the HCDOC, the laundry services were inadequate to provide him with clothing that was clean enough to be considered hygienic. Proverb states that he was regularly not provided with a change of clothing or

15

underwear for four to six weeks. Proverb was also provided with stained underwear, and was told he would have to either wear that underwear or none at all. Proverb claims that the soles of his shoes had almost entirely fallen off before he was provided with new shoes. Proverb states that during the more than forty days he spent in an observation cell, first on Unit 1C and then on Unit 2A, he only received two safety smocks for the entire period. When Proverb grieved the laundry problem, he was given clean clothing only after agreeing to recant his grievance. Later, Proverb complained directly to O'Mara by letter.

Proverb asserts that in July of 2007, when he was on suicide watch, he went without a toothbrush for up to a week at a time. Further, he states that he was denied access to a towel or soap to enable him to shower for several days at a time by C.O.s Bowers and Goldmann.

## Endangerment and Harassment by Inmates

On January 10, 2007, C.O. Adams took Proverb's legal mail and read it aloud, including the nature of Proverb's charges, within earshot of general population inmates. Further, in addition to being allowed to place urine-soaked wads of toilet paper under Proverb's cell door, as described above, officers

16

allowed inmates to further harass Proverb by kicking and banging on his cell door.

Proverb asserts that in August of 2007, while he was still housed on Unit 2A, some of his legal and personal paperwork had been stored in the unit's locked storeroom by one of the officers. On one occasion, however, C.O. Bass unlocked the unit's storeroom and inadvertently left the room unsecured and unattended. As a result, inmate Malave and another inmate gained access to the storeroom, went through Proverb's paperwork, and obtained Proverb's family contact information as well as a witness list from his case. Malave proceeded to write letters to Proverb's wife threatening to rape and kill her and her eleven year old daughter, and to the defense witnesses in Proverb's case, threatening them so that they would not testify on Proverb's behalf. While Proverb concedes that Boss did not intentionally endanger Proverb by leaving the storeroom unlocked and unattended, he does assert that Boss' actions endangered his safety.[5]

---

[5]Proverb asserts a claim that Boss' actions, by affecting the witnesses in his criminal case, deprived him of his right to a fair trial, to present a defense, to due process, and to confront the witnesses against him. This Court will abstain from hearing this claim at this time under the Younger abstention principle. See Younger v. Harris, 401 U.S. 37, 43-44 (1971)

17

While he was housed in Unit 2B, after leaving his first suicide watch and before being assigned to Unit 2A, Proverb had to leave his cell to get his own meal tray at meal times. Proverb states that when he and the other P.C. inmates on Unit 2B were released from their cells to get their meals, C.O.s Archenbault, Revis, Rosado, Ellis, Antillis and others would announce, to the entire unit, "Skinners' Meal Time," "Rippers' Breakfast," or "Pampers Poachers' Lunch."[6] These officers also allowed other inmates on the unit to yell out of their cells to torment and harass the P.C. inmates. Proverb names C.O.s Adams and Marinowski as individuals who have pointed out his charges to inmates from other classifications, and subjected them to harassment and threats of violence from other inmates. Proverb

_____

(providing that federal courts should abstain from entertaining cases involving issues that are the subject of currently pending state judicial proceedings where (1) there is an ongoing state proceeding which is judicial in nature; (2) important state interests are involved; and (3) the plaintiff will have an adequate opportunity in the state proceeding to raise the constitutional challenges presented by the federal law suit). As I find that all of these factors are present here, abstention under Younger is the appropriate approach to take with this claim. Accordingly, I recommend dismissal of any claims alleging the prospective violation of Proverb's rights at his yet-to-be-held criminal trial.

[6] "Skinner," "Ripper," and "Pampers Poacher" are all prison slang terms for sexual offenders who victimize children.

18

also names C.O.s Moloney and Lucas as individuals who allowed
harassment of Proverb and other P.C. inmates by the other inmates
on Unit 2B when Proverb was again placed temporarily on that unit
in February of 2008.  Proverb also alleges, without reference to
any specific incidents, that when he was on Unit 1C, he
experienced harassment and assault by inmates and that unnamed
C.O.s on that unit failed to act to protect him.

## Mental Health Care

Proverb was placed on suicide watch twice during his
incarceration.  As previously noted, the nurse who conducted the
intake interview of Proverb placed Proverb on a suicide watch in
January of 2007.  In the spring of 2007, Proverb reports that he
was depressed, and planning to kill himself on July 6, 2007, his
wedding anniversary.  On July 5, 2007, he was in the library
researching wills when two officers, Sgt. Boyer and C.O. Small
approached him and escorted him to Unit 1C to again be placed on
suicide watch in that unit.  Proverb was strip-searched and given
a safety smock to wear.  Proverb remained on suicide watch for
more than thirty days.  During this time, Proverb reports he was
seen by a mental health worker once or twice a week for
approximately fifteen minutes at a time.  Proverb says he

19

requested to see mental health workers more than that, but was usually ignored. Proverb states that after two weeks, Mrs. Barber, a mental health worker, told him he no longer needed to be on suicide watch, and that keeping him on suicide watch after the need subsided, with constant observation and restricted privileges, was actually punitive, and not therapeutic. Proverb says that the officers would not remove him from suicide watch or the observation cell. Instead, at the convenience of the officers, they would move him out of the observation cell and into a regular cell when they needed the observation cell for someone else, and that he would be moved back into it when no one else needed it.

Proverb asserts that during his time on suicide watch, including the time that he was legitimately on such a watch and the time he remained on suicide watch after the need had abated, he was treated differently than other inmates who were a greater threat to themselves, in that they had actually attempted suicide, rather than just thought about it. Other inmates, Proverb claims, were seen by mental health workers more frequently than he was, and not left in an observation cell as long as Proverb.

20

Barber told Proverb that she thought he had bipolar disorder
and agreed with the borderline personality disorder diagnosis he
had received in 1990.  When Proverb saw Dr. Harris, however, he
told Proverb "There's nothing wrong with you.  It's all in your
head."[7]

Proverb states that in September of 2007, he requested many
times to speak with someone from the mental health department in
regard to the incident that occurred with Antillis and the other
officers regarding Proverb's racial sentiments.  Proverb was not
seen by Dr. Harris until at least mid-October.  When Proverb did
finally see Dr. Harris and explain what had occurred, and his
feelings about it, Dr. Harris told Proverb that he was
overreacting.  At that point, Proverb determined that seeking
mental health care at the HCDOC was a waste of time, and he ended
his efforts to obtain mental health counseling.

## Denial of Access to the Courts

Proverb complains that for some period of time, he was
denied out-of-cell time during business hours.  As a result, he
was unable to call his attorney during that period of time.
Grievance forms Proverb submitted with his complaint indicate

[7]The irony of this comment coming from a mental health
professional has not escaped the Court.

21

that, at least on some occasions, he was afforded out-of-cell time between 8:00 a.m. and 10:00 a.m., which enabled him to call his attorney, although Proverb alleges that this schedule was not consistently provided to him. Proverb states that when he complained about not being able to call his attorney, he was told to communicate with his attorney by letter.

Proverb states that educational programs were taught in the law library during the same four hours per week that P.C. inmates were permitted access to the library for legal research. As a result, inmates were not able to discuss their legal work with other inmates because a class was going on at the time, and the noise and activity of the class hindered legal research efforts. Further, Proverb asserts, the law librarian at the HCDOC was hired as a teacher and has no particular education or knowledge of the law. Proverb concedes, however, that the law librarian can and does help inmates with legal research when she is not teaching.

## Strip Searches

Proverb alleges that in 2007, he spent approximately forty days in an observation cell, on suicide watch. During that time, he states that he was subjected to well over 120 strip searches.

22

He states that he was strip searched every time he had been out
of his cell, whether it was to speak with mental health workers,
to change cells, or to have out-of-cell time. The strip searches
occurred regardless of the fact that while on suicide watch,
Proverb was kept entirely separate from other inmates, was housed
in an observation cell, and, during time out of his cell, he was
never out of the proximity or sight of HCDOC officers. During
his out-of-cell time, he was permitted only to sit at a table
close to an officer and within sight of an officer at all times.

Disciplinary Reports and Actions

Proverb alleges that C.O. Moloney falsified a disciplinary
report against Proverb with the intention of having him
transferred to Unit 2B's punitive Restricted Housing Unit.
Proverb states that on December 11, 2008, Moloney, having
previously made threats to have him transferred to Unit 2B, and
in order to cause him physical and mental harm, filed a
disciplinary report that wrongly alleged that Proverb had incited
a riot, demonstration or work stoppage, used profanity in making
a derogatory remark at a female staffperson, and disobeyed a
staff member. At the disciplinary hearing held on January 4,
2009, Proverb admitted that he had called Moloney a vulgar name,

not the female staffperson present, and pleaded guilty to being
disrespectful to an officer. As a sanction, Proverb lost two
hours of out-of-cell time.

Proverb was, on one occasion, denied the opportunity to sign
up for bible study class by C.O. Marinowski. Proverb states that
when Marinowski refused to immediately call a superior officer to
the unit to resolve the issue, Proverb yelled at him. Proverb
alleges that Marinowski then locked him down without first filing
appropriate paperwork or seeking disciplinary charges against
him, causing him to miss forty-five minutes of his out-of-cell
time.

Proverb also complains that on October 16, 2008, Sgt.
Duclose became annoyed with Proverb because he was vehemently
insisting that the C.O.s on his unit obtain a dinner tray for an
inmate who was terminally ill and had been frequently fed cold
bagged meals over the previous several days. When Duclose denied
Proverb's request, Proverb argued with him. Finally, Proverb
stated "Great f---ing humanitarianism in this place." Proverb
claims that this comment was not directed at Duclose
specifically, or in a threatening manner, but that Duclose locked
Proverb down anyway, causing him to miss an hour of out-of-cell

24

time. Initially, Proverb objected to being locked down, but eventually complied to avoid being moved to Unit 2B. Proverb states that no disciplinary report was ever generated and to his knowledge the incident was not documented in any way.

## Discussion[8]

### I.   Section 1983 Claims

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law. See 42 U.S.C. § 1983[9]; Parratt v. Taylor, 451 U.S. 527, 535 (1981) (overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-331 (1986)); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002). In order for a defendant

---

[8]The claims as identified herein will be considered for all purposes to be the claims raised in the complaint. If Proverb disagrees with this identification of the claims, he must do so by objecting to this Report and Recommendation, or by properly moving to amend his complaint.

[9]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

25

to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997). Because Proverb's claims allege violations of federal constitutional law effected by state actors, his suit arises under § 1983.

## II. Pretrial Detainee Status

Proverb was a pretrial detainee at the HCDOC at the time the events he describes occurred. Detainees have a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free of punishment. See Surprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005) (citing O'Connor v. Huard, 117 F.3d 12, 15 (1st Cir. 1997)). Loss of freedom of choice and privacy are inherent incidents of any confinement, however, and therefore, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, constitute punishment. Bell v. Wolfish, 441 U.S. 520, 537 (1979); O'Connor, 117 F.3d at 15. The restriction or condition imposed, however, must not be exaggerated or excessive relative to its purpose. Bell, 441 U.S. at 538. The issue in evaluating claims by a pretrial detainee,

26

therefore, is ultimately whether the conditions of confinement were reasonably related to a legitimate state interest or were intended instead as punishment. See Surprenant, 424 F.3d at 13; Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 317 (1st Cir. 1995).

III. Free Exercise of Religion Claim

Proverb asserts that he was denied access to bible study classes for six to seven months in 2008, and that when he was moved to Unit 1C, his access to bible study classes was reduced from three times a week to just once a week, that the one class he was allowed to attend was not with the teacher of his choosing, and that even his once weekly classes were, on occasion, denied. Proverb claims that these actions violated his First Amendment right to the free exercise of his religion.

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The first religion clause of the First Amendment, the Establishment Clause, mandates the separation of church and state. The second religion clause of the First Amendment, the Free Exercise Clause, requires that government respect and not

interfere with the religious beliefs and practices of those protected by the United States Constitution. See Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).

A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). The retained rights include the right to the free exercise of religion. Cruz v. Beto, 405 U.S. 319, 322 (1972). Prisons must provide all inmates reasonable opportunities to exercise religious freedom. Id. at 322, n.2. When a prisoner raises a claim under the Free Exercise Clause, he must "establish that a challenged policy restricts the inmate's free exercise of a sincerely held religious belief." Brown-El v. Harris, 26 F.3d 68, 69 (8th Cir. 1994); Barnett v. Comm'r, N.H. Dep't of Corr., No. Civ. 98-305-JD, 2000 WL 1499490 at *2 (D.N.H. Apr. 26, 2000).

The Supreme Court has held that a prisoner's sincerely held religious beliefs must yield, however, if contrary to prison regulations that are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-352

(1987) (finding that the Constitution does not require the prison
to sacrifice legitimate penological objectives to satisfy an
inmate's desire to exercise his religion so long as an inmate is
not deprived of all forms of religious exercise). A prison
regulation must have a logical connection to the legitimate
governmental interests invoked to justify it. Turner, 482 U.S.
at 89-90. That connection may not be "so remote as to render the
policy arbitrary or irrational." Id. Free exercise claims
brought by prisoners are "judged under a 'reasonableness' test
less restrictive than that ordinarily applied to alleged
infringements of fundamental constitutional rights." Ford v.
McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (quoting O'Lone, 482
U.S. at 349); see also Shaw v. Murphy, 532 U.S. 223, 227-229
(2001).

    Proverb claims that the denial of access to bible study
classes constituted a violation of his right to practice his
religion. I disagree. Proverb has not asserted that he was
denied the right to practice his religion, to follow a particular
set of religious beliefs, access to religious services or to a
chaplain, minister, or other spiritual adviser, a bible, or the
ability to study the bible. Proverb bases his Free Exercise

                                29

claim only on the allegation that he was denied, at times, access to group bible study classes led by a teacher. Proverb states that HCDOC officials did make efforts to work with Proverb to afford him a weekly opportunity to attend bible study class, but not always at the frequency or with the teacher he preferred.

I find that the facts alleged by Proverb, even construed liberally, fail to state a violation of his First Amendment right to practice his religion. Like all group activities in prison, educational groups, including bible study, are subject to reasonable regulation to insure the security and safety of the institution, staff, and the inmates, and are not constitutionally guaranteed. See Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976) (noting that as a general rule, inmates have no constitutional interest in participating in discretionary jail programming). Nothing in the HCDOC decision to restrict Proverb's bible study classes suggests that this restriction was imposed unreasonably. To the contrary, restrictions on Proverb's bible study classes were designed to protect him, and HCDOC officials worked with Proverb in an effort to make sure he could have reasonable access to the study groups. More importantly, however, I find that attendance at bible study groups is not essential to the exercise

30

of one's religious beliefs or practices where no other denial of access to religious programming, services, or materials is alleged. Accordingly, I recommend that the claims alleging a denial of First Amendment rights occasioned by the denial of access to bible study classes be dismissed from this action.

Excessive Force Claims

Proverb asserts that on several occasions, while incarcerated at the HCDOC, he was subjected to significant excessive force. First, on January 9, 2007, he alleges that he was badly beaten up in his cell during a strip search by defendants Pinciaro, Rodriguez, Adams, Ellis, and three unnamed C.O.s Second, Proverb claims that during the second week of his incarceration, later in January of 2007, defendant Rosado unnecessarily wrenched his arms behind him while he was in handcuffs in order to cause him physical pain. Finally, in September of 2007, Proverb alleges that he was again beaten during a strip search by defendants Antillis, Gordon, and Granville.

As previously observed, the Fourteenth Amendment protects a pretrial detainee from excessive force that amounts to punishment. See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir.

31

2007); Surprenant, 424 F.3d at 18. In determining whether a plaintiff has stated a claim for unconstitutionally excessive force, the court should look to the following four factors: (1) the need for the use of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury inflicted, and (4) "whether the force was applied in good faith to maintain or restore discipline or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Additionally, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n.3 (1st Cir. 1990).

On all three occasions listed above, Proverb describes a situation where he was relatively physically helpless by virtue of being outnumbered, naked, and in one instance, handcuffed, and that he was not exhibiting any behavior which required the use of force against him. Proverb describes a great deal of force being used against him during the cell beatings, as his head was repeatedly shoved and banged against a concrete wall and punched, and his ankles and legs were kicked. While Proverb does not

32

report needing or seeking medical help, he states he was injured by bruising and swelling, pain, and migraine headaches that lasted to the time of filing this action. During the incident with Rosado, while the force was not extreme, Proverb describes it as entirely unnecessary. Proverb states that the handcuffs were pulled in a way that hurt him, and when he made Rosado aware of the situation verbally, Rosado increased the pressure on Proverb's wrists. Proverb claims that, while he was being beaten, he was persistently taunted, threatened, and yelled at. Proverb's recitation of the facts of these three incidents depicts scenarios where the actions and harm alleged were inflicted by each of the defendants with the purpose of scaring Proverb, inflicting pain, and asserting dominance.

Proverb does not allege that each defendant present during the two beating incidents participated in the actual physical beating. Instead, he alleges that some of the officers beat him, while all of the officers watched, failed to stop the harm, and participated in the verbal harassment, threatening, and taunting. Accordingly, I find that all of the defendants named in these claims: Pinciaro, Rodriguez, Adams, Ellis, three John Doe

officers[10], Rosado[11], Antillis, Gordon, and Granville, can be

served with excessive force claims for the events described, and

---

[10]Although I am authorizing suit against the John Doe
defendants, Proverb must obtain their names in order to properly
effect service upon them. To this end, upon service of this
action on the named defendants, Proverb can serve those
defendants with interrogatories to obtain the names of the John
Doe officers pursuant to Fed. R. Civ. P. 33(a) which states in
pertinent part:

> Without leave of court or written stipulation,
> any party may serve upon any other party
> written interrogatories, not exceeding 25 in
> number including all discrete subparts, to be
> answered by the party served or, if the party
> served is a public or private corporation or a
> partnership or association or governmental
> agency, by an officer or agent, who shall
> furnish such information as is available to
> the party.

Once the names of the John Doe defendants are obtained, Proverb
may file a motion to amend his complaint to add those defendants
to this action. Once the defendants are added to the action by
name, the Clerks' office will then prepare the appropriate
paperwork and forward it to the United States Marshal's office to
effect service of those defendants in the manner directed in the
Simultaneous Order.

[11]Proverb has filed a motion seeking to dismiss Rosado from
this action on the grounds that he is no longer employed at the
HCDOC. That is not a bar to this action against him, as Proverb
has stated a timely claim against Rosado alleging a
constitutional violation while Rosado was acting under color of
state law. Accordingly, I will authorize service of this claim
on Rosado. In order to effect service, however, it may be that
Proverb must obtain his current address from the HCDOC
defendants, if known, during the discovery process. In the
meantime, service will be attempted of Rosado by serving the
complaint at the HCDOC.

34

I will so direct in my Order issued simultaneously with this
Report and Recommendation (hereinafter the "Simultaneous Order").

## V. Verbal Abuse Claims

In general, there is no constitutionally protected right
held by a prisoner not to be verbally abused or harassed.    See
Shabazz v. Cole, 69 F. Supp. 2d 177, 198-201 (D.Mass. 1999)
(citing authority to explain that racial slurs and verbal threats
do not violate a prisoner's constitutional rights).  Proverb,
however, as a pretrial detainee, is protected by the Due Process
Clause of the Fourteenth Amendment from verbal harassment that is
designed to punish him.  See Bell, 441 U.S. at 534 ("[W]hat is at
issue when an aspect of pretrial detention that is not alleged to
violate any express guarantee of the Constitution is challenged,
is the detainee's right to be free from punishment. . . .")
(emphasis in original).  Proverb claims that he was threatened
and taunted with the purpose of causing him to be afraid, and to
make his quality of life in the HCDOC unpleasant.  These
allegations are sufficient to support a claim that Proverb was
harassed by the defendants as a form of punishment, in violation
of the Fourteenth Amendment.  I will, therefore, direct that this
claim be served on the following defendants, who Proverb asserts

35

verbally abused and threatened him, in my Simultaneous Order:
Pinciaro, Rodriguez, Adams, Ellis, three John Doe officers,
Archenbault, Adams, Revis, Rosado, Antillis, Moloney, Lucas,
Gordon, and Granville. I have excluded from this list defendant
Riley who, Proverb claims, taunted him on one occasion in
September of 2007. I find that Proverb's allegations against
Riley are insufficient to assert a constitutional cause of
action, and I recommend that Riley be dismissed as a defendant
from the verbal abuse claim.

VI. Free Speech Claim

Proverb asserts a First Amendment claim grounded on
Antillis' act in forcing him to repeatedly state "I love black
people," claiming that the officer's actions violated his right
to freedom of speech and expression.    While prisoners forfeit
certain freedoms, as a necessary corollary of prison life, "even
the worst of the worst prisoners retain constitutional
protection, specifically including their First Amendment rights."
Beard v. Banks, 548 U.S. 521, 542 (2006) (Steven, J., dissenting)
(citing O'Lone, 482 U.S. at 348 (internal quotations omitted);
see Turner, 482 U.S. at 89 (When a prison regulation impinges
upon First Amendment freedoms, it is invalid unless "it is

36

reasonably related to legitimate penological interests.").

The First Amendment right to free speech is enforceable against government actors who, by their official actions, suppress this right instead of protecting it. "[U]ncontrolled official suppression of the speaker cannot be made a substitute for the duty to maintain order." Edwards v. South Carolina, 372 U.S. 229, 245 (1963) (internal citations omitted). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." W.V. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) (invalidating an outright compulsion of speech because "the first amendment does not 'le[ave] it open to public authorities to compel [a person] to utter' a message with which he does not agree); see also United States v. United Foods, Inc., 533 U.S. 405, 410 ("Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views."); Wooley v. Maynard, 430 U.S. 705, 714 (1977) (requiring New Hampshire drivers to bear the State's motto on their license plates

37

constitutes an impermissible compulsion of expression).

> When the imposition of [] government authority is
> based on the content of the speech, such
> [r]egulations which permit the Government to
> discriminate on the basis of the content of the
> message cannot be tolerated under the First
> Amendment.  But when the regulations in question go
> beyond content discrimination and turn on the
> specific views expressed by a speaker, such
> [v]iewpoint discrimination is [] an egregious form
> of content discrimination and [t]he government must
> abstain from regulating speech when the specific
> motivating ideology or the opinion or perspective
> of the speaker is the rationale for the
> restriction.

Circle Schs. v. Pappert, 381 F.3d 172, 180 (3d Cir. 2004) (citing

Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984) and Rosenberger

v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829

(1995)) (internal quotations omitted).

In order to recover under § 1983 for a violation of First

Amendment rights, a plaintiff must allege that the defendant

intended to inhibit speech protected by the First Amendment,

Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994), and that his

"speech was in fact chilled or intimidated."  Sullivan v.

Carrick, 888 F.2d 1, 4 (1st Cir. 1989).  Crediting Proverb's

allegations as true, as I must, I find that Antillis, upon seeing

Proverb's confederate flag tattoo, forced him to state that he

loved black people in an effort to inhibit what Antillis believed

38

was an expression of Proverb's anti-African-American views.
Proverb states that his speech was, in fact, chilled, as he was
coerced, by physical force, to express an opinion against his
will.[12]  Proverb's allegations regarding Antillis' actions, and
the tacit acquiescence thereto of Gordon and Granville, who were
present but failed to act to protect Proverb's free speech
rights, state a claim under the First Amendment.  In my
Simultaneous Order, I will direct that this claim go forward
against defendants Antillis, Gordon, and Granville.

VII. Endangerment Claims

Proverb claims that being verbally abused and harassed by
HCDOC officers endangered his safety.  Specifically, Proverb
claims that officers announced the nature of his charges to the
entire unit, often by using derogatory terms for child sexual
offenders in referring to Proverb and other P.C. inmates.

The safety and security of all prisoners is protected by the
Constitution.  See DeShaney v. Winnebago County Dep't of Soc.
Servs., 489 U.S. 189, 190 (1989); Youngberg v. Romeo, 457 U.S.

---

[12]While not relevant to the sufficiency of the allegations,
it should be noted that, in his complaint, Proverb states that he
does not hate black people.  Accordingly, while being forced to
say "I love black people," was allegedly against his will, it is
not clear whether or not the sentiment was contrary to his
personal convictions.

39

307, 315-16 (1982). To state a constitutional claim that the defendants endangered him, Proverb must allege that the defendants were aware of and deliberately indifferent to a serious risk to his safety. See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002). Here, there is no question that the defendant officers who refer to inmates, loudly, on a multi-classification pod, as sex offenders, particularly by derogatory names, are aware of the effect that will have on the remainder of the inmate population. And, lest there was any doubt, Proverb states that such incitement would cause unit-wide screaming and taunting of the P.C. inmates by other inmates that would last for up to half an hour at a time and be loud enough to drown out conversation. Further, Proverb's placement on P.C. status indicates that he is, by nature of those charges, at risk of harm from other inmates. The facts alleged are sufficient to support a claim that certain verbal abuse, and threats by officers are known to incite other inmates, and are known to cause a safety risk to those other inmates, and that therefore, the officers who engaged in this type of taunting unreasonably placed Proverb in danger of harm. I find, therefore, that this claim may proceed against defendants: Adams, Marinowski, Archenbault, Revis,

40

Rosado, Ellis, Antillis, Moloney, and Lucas, as well as John Doe defendants.

Proverb also alleges an endangerment claim against Bass, who, he claims, inadvertently allowed inmates access to damaging information in a storeroom, which put Proverb in danger. Proverb states, however, that Bass' actions were inadvertent, and not done deliberately in an effort to harm or punish Proverb. Further, despite the fact that, as a result of Bass' actions, harm actually was done, that does not transform what Proverb concedes was a negligent act into a constitutional violation. Accordingly, I recommend that any intended endangerment claim against Bass be dismissed from this action.

VIII.   Conditions of Confinement Claims

"A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests." Surprenant, 424 F.3d at 19; see Cameron v. Tomes, 990 F.2d 14, 18 (1st Cir. 1993) ("It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure physical safety."). To establish that conditions of confinement are unconstitutional, a

41

pretrial detainee must first demonstrate that, when viewed
objectively, "the conditions of confinement deny him the minimal
measure of necessities required for civilized living."
Surprenant, 424 F.3d at 19. Second, the plaintiff must show that
the defendant against whom the violation is alleged was
deliberately indifferent to the inmate's health or safety. Id.
at 18-19.

A.    Unsanitary Conditions

      i.    Toilet Paper

Proverb alleges that on January 9, 2007, when he was placed
on suicide watch, Pinciaro directed an officer to remove the
toilet paper from his cell. Proverb was forced to do without
toilet paper for four days, requiring him to wash himself by
squatting in the same sink he had to get drinking water from, to
wipe with his hands, and to eat with fecal matter under his
fingernails. Proverb has alleged conduct that does not appear to
be linked to a legitimate penal concern, and intended only to
punish Proverb, a pretrial detainee. Proverb has also alleged a
denial of the "minimal measure of necessities required for
civilized living." Id. at 19. I find that he has stated a

Fourteenth Amendment Due Process claim against Pinciaro for the denial of toilet paper.

### ii. Linens

Proverb alleges that when he was placed on suicide watch on January 9, 2007, he was given only a urine-spoiled mattress with no blanket or pillow. Although the denial of a sanitary place to sleep might state a constitutional cause of action under these circumstances, Proverb has failed to name any defendant responsible for this deprivation and I recommend that this claim be dismissed on that basis.

### iii. Laundry

Proverb states that during his incarceration at the HCDOC, he was regularly denied clean uniforms and underwear for four to six weeks at a time. Proverb also claims that his "clean" underwear was not always given to him in a clean or hygienic condition, and that he forcing him to wear stained underwear or none at all. Proverb also asserts that he was made to wear shoes until they were practically in tatters before receiving a new pair, and that even safety smocks given to him during suicide watches were rarely replaced. I find that Proverb's allegations that, for weeks on end, he was denied clothing that meets a

43

reasonable degree of cleanliness states a claim for a deprivation
of the minimum necessities of civilized life. See id. Further,
I find that Proverb has stated that he advised a number of HCDOC
officers that he needed clean clothing, and that he was denied
such clothing until he filed a grievance. At that time, Proverb
was given clean clothing only when he agreed to withdraw his
grievance. Proverb does not state which officer or officers
denied him laundry, but he does state that he notified both
O'Mara and Sgt. Barnes of the situation. Accordingly, I will
direct service of this claim on O'Mara and Barnes in my
Simultaneous Order. Should Proverb discover additional
defendants responsible for this deprivation during the discovery
process, he may move to amend his complaint to include those
individuals.

### iv. Personal Care

Proverb claims that while he was on suicide watch, he was
denied access to a toothbrush for a one-week period, and soap and
towels for several days at a time, which prevented him from
showering for several days. These allegations are insufficient
to allege more than isolated short-term denials of hygiene
products, and do not rise to the level of constitutional

44

deprivations. I therefore recommend that these claims be dismissed.

### v. Food Service

Proverb complains that his food was delivered to him on a tray slid under his cell door, often by someone's foot, and that his milk carton was often dirtied when it was slid under the door. Proverb has not alleged that either he or his food was damaged or harmed in any way by this method of delivery. Proverb also explains that this manner of feeding inmates, in their cells, was designed to accommodate the security needs of a multi-classification housing unit. Accordingly, I find that under-the-door cell feeds are linked to legitimate security concerns, and have not been demonstrated to be intended as punitive or to be otherwise damaging. Accordingly, I recommend dismissal of this claim.

### B. Exercise and Fresh Air

Proverb generally complains about the lack of opportunity to exercise. Proverb states that his cell is too small to do any meaningful exercise, that on the occasions he is given access to the gym, it is to play basketball, which he chooses not to participate in, and that the recreation yard, which provides

45

inmates with both the opportunity to exercise and fresh air, is closed six months a year between October 15, and April 15. Proverb's inability to exercise as he chooses, while frustrating to Proverb, is not a deprivation of the minimum necessities of civilized living. See id. at 19. Proverb admits that he has the opportunity to play basketball approximately once per week but he chooses not to avail himself of that opportunity. Courts have found that limiting exercise to one hour per week is not per se unconstitutional. See Torres Garcia v. Puerto Rico, 402 F. Supp. 2d 373, 383 (D.P.R. 2005) (citing cases). No facts are alleged to indicate that the denial of more frequent exercise opportunities are intended to be punitive. Further, no constitutional issue arises from the denial of outdoor exercise. Id. Accordingly, I recommend that the exercise and fresh air claims be dismissed from this action.

C. Cell Conditions

i. Size

Proverb states that he was housed in a small cell crowded with furniture with another inmate. Proverb has not stated any particular harm caused by the size of his cell, but states, instead, that the cell does not comport with federal Department

46

of Justice standards for prisons. The question presented here, however, is not whether Proverb's cell comports with federal standards for cell size, but whether the cell is so small that confinement therein constitutes punishment. Proverb has not alleged anything regarding the size of the cell that would allow me to infer that the size of Proverb's double-bunked cell is so out of the ordinary or so small as to constitute punishment. See Inmates of the Suffolk County Jail v. Rufo, 12 F.3d 286, 293-94 (1st Cir. 1993) (citing Bell, 441 U.S. at 541 for the proposition that placing two inmates in a cell intended for one inmate does not, without more, constitute punishment). Accordingly, I recommend that this claim be dismissed.

ii. Water Leak

Proverb states that he reported a water leak in his cell was causing sufficient noise that his sleep was interrupted. Proverb notified HCDOC officials who responded by requesting that the maintenance department repair the leak. When, after eight days, the leak was not repaired, Proverb was moved to a different cell. There is no allegation in the complaint sufficient to allow me to find that any HCDOC official did anything intentionally, or with deliberate indifference to Proverb's needs, to deprive Proverb of

47

a quiet cell. To the contrary, HCDOC officials responded to
Proverb's request to have the leak fixed or his cell moved.
Although the move may not have occurred as quickly as Proverb
would have liked, I cannot find that the actions of the HCDOC
officials, and the presence of a water leak, amount to
unconstitutional punishment, and I recommend that this claim be
dismissed.

### iii. Natural Light

Proverb states that he is denied natural light because his
cell faces a nearby brick wall located to block all natural
light, and because the recreation yard is closed for six months
each year. While courts have held that the constitutional
requirement that an inmate be provided with adequate shelter
includes the provision of adequate lighting, see Hoptowit v.
Spellman, 753 F.2d 779, 783 (9th cir. 1985), I can find no legal
authority for the proposition that light must be natural light to
be considered constitutionally adequate. As Proverb does not
allege inadequate light or any particular harm caused by the lack
of natural light, I recommend that this claim be dismissed.

iv.  Excessive Noise and Light on Unit

Proverb complains that, because he is held in a multi-
classification housing unit, inmates and staff are active at all
hours of the night.  This results in the interruption or
prevention of Proverb's sleep due to slamming doors, televisions,
officer radios, overhead lights and other sleep disruptions.
Proverb claims he has lost enough sleep due to these problems to
result in physical and mental harm.  Proverb claims to have
complained about these issues but received no response from the
HCDOC administration.  While these conditions are not ideal, by
Proverb's own admission the conditions are not designed to be
punitive, but are part and parcel of living in a multi-
classification housing unit, and accommodating all of the inmates
therein.  While difficult to deal with, these inconveniences of
group living are not unconstitutional in gravity, and I recommend
that the claims alleging excessive noise and light on Proverb's
housing unit be dismissed.

v.  Noxious Odor

Proverb asserts a claim based on the fact that an inmate in
his housing unit smelled exceptionally badly, causing a noxious
odor to exist on the entire unit.  Proverb claims that the HCDOC

49

officials did not do enough to control this odor and the living environment on the unit. Because Proverb has stated neither a constitutional right to an odor-free environment, any harm caused by the bad smell, or any defendants to this claim, I recommend that the claim be dismissed.

D. Lockdown

i. Twenty-Two Hours Per Day

Proverb alleges that, because he is a P.C. inmate who cannot live on the P.C. unit, and he is not a maximum security inmate, he is forced to live on a multi-classification unit. The confines of this housing unit, and the need to accommodate all of the inmates therein, require that Proverb be locked down twenty-two hours per day, every day. Proverb alleges that he receives two separate one-hour out-of-cell periods daily, but that these periods frequently conflict with other programming, so that he is unable to use the telephone during his out-of-cell time if he participates in programming. Proverb further complains that he is denied access to some programming that is available to general population inmates because of the restrictions placed on him by virtue of his housing unit. Proverb also claims that the out-of-cell time he gets is often disrupted or shortened by regularly

50

occurring events on the unit, such as fire drills, lockdown drills, pod meetings, laundry, mail call, etc. Proverb essentially alleges that, because he requires protection both from general population inmates and from an inmate housed in the P.C. unit, he is forced to live on a unit where he must be locked down for more time than his own personal security risk to the institution merits. While this may be true, the allegations themselves demonstrate that the housing decision made by HCDOC officials, while resulting in a restrictive schedule, was not done with the subjective intent to punish Proverb or with indifference to his health and safety. To the contrary, Proverb's housing placement has been made to accommodate his particular security needs. Accordingly, I recommend dismissal of this claim.

### ii. Separate Housing Facility

Proverb further claims that inmates in his position -- pretrial P.C. inmates who cannot live in the normal P.C. population -- should be housed in an entirely separate facility, or at least on a separate unit, so that they might enjoy the freedom enjoyed by general population inmates. While that scenario might be ideal, it does not appear that such a facility

51

exists at the HCDOC.  In addition to the fact that the
Constitution does not guarantee pretrial inmates ideal lodgings
within a jail setting, Proverb does not name a defendant arguably
responsible for the failure of the HCDOC to have more housing
space than it actually does, and I recommend that this claim be
dismissed.

### iii. Marinowski and Duclose Incidents

Proverb claims that during the second week of October of
2007, Proverb was using the phone during his out-of-cell time.
While Proverb was on the phone, Marinowski put out a sign-up
sheet for that evening's bible study, and then removed the sheet
before Proverb had the opportunity to sign up.  Proverb objected,
loudly, to Marinowski's refusal to either let Proverb go to bible
study, or immediately call a supervising officer to intervene.
In response to Proverb's yelling, Marinowski locked Proverb back
into his cell forty-five minutes before his out-of-cell time was
due to end.

Similarly, on October 16, 2008, Duclose, responding to
Proverb's loud opinions and objections to a decision Duclose had
made, locked Proverb in his cell when he still had an hour of
out-of-cell time left.  While Proverb attempts to couch this

52

claim as a denial of his First Amendment right to express his opinion about the humanitarian qualities of the HCDOC, the facts, as alleged in the complaint, demonstrate that Duclose's was a measured response to a situation in which he was being challenged by an inmate on his unit.

In both of these incidents, Proverb claims it was a denial of his due process rights to lock him in his cell for something that did not result in either officer generating a diciplinary or incident report. It is precisely this sort of administrative decision by prison officials that the courts are loathe to micromanage. See Johnson v. California, 543 U.S. 499, 529-30 (2005); Bell, 441 U.S. at 547-48. Where, as here, Proverb alleges a minimal deprivation of freedom, and indicates, by his own recounting of the event, that the officers Malinowski and Duclose acted reasonably in response to Proverb's angry and confrontational behavior, the court cannot find that the small loss of out-of-cell time approaches the standard necessary to establish a constitutional violation.

Proverb claims that Duclose, by not filing paperwork, was attempting to cover up the fact that he had squelched Proverb's legitimate exercise of his First Amendment right to free speech.

The facts alleged, however, belie that assertion. Neither
Marinowski nor Duclose locked Proverb into his cell until the
confrontation escalated and Proverb was yelling at the officer.
The lockdowns were clearly attributable to the manner in which
Proverb was acting, not the content of what he was saying.
Accordingly, I recommend dismissal of these claims from this
action.

## IX.   Inadequate Mental Health Care

Proverb alleges that on a number of occasions he requested
mental health attention from HCDOC mental health workers and did
not receive it.  Proverb does state that he was seen by a mental
health worker once or twice a week, for fifteen minutes, while he
was on suicide watch.  Proverb also states that while one mental
health worker felt that Proverb was suffering from both bipolar
disorder and borderline personality disorder, and that in 1990
Proverb was previously diagnosed with borderline personality
disorder, another mental health worker disagreed.

The Eighth Amendment protects prison inmates from prison
officials acting with deliberate indifference to their serious
medical needs.[13]   See Farmer v. Brennan, 511 U.S. 825, 831

---

[13]The Fourteenth Amendment is at least as protective of a
pretrial detainee's right to medical and mental health care as

(1994). To assert a viable cause of action for inadequate

medical care, a prisoner must first state facts sufficient to

allege that he has not been provided with adequate care for a

serious medical need. Id. at 831; Rhodes v. Chapman, 452 U.S.

337, 347 (1981); Estelle, 429 U.S. at 106. The inmate must then

allege that a responsible prison official was aware of the need

or of the facts from which the need could be inferred, and still

failed to provide treatment. Estelle, 429 U.S. at 106. A

serious medical need is one that involves a substantial risk of

serious harm if it is not adequately treated. Barrett v. Coplan,

292 F. Supp. 2d 281, 285 (D.N.H. 2003); Kosilek v. Maloney, 221

F. Supp. 2d 156, 180 (D. Mass. 2002) (citing Farmer, 511 U.S. at

835-47); see also Gaudreault, 923 F.2d at 208 (defining a serious

medical need as one "that has been diagnosed by a physician as

mandating treatment, or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's

attention.") (internal citations omitted). These protections

---

the Eighth Amendment. See United States v. Lopez, 327 F. Supp.
2d 138, 144 (D.P.R. 2004) (citing, inter alia, Fischer v. Winter,
564 F. Supp. 281, 298 (N.D. Cal. 1983) ("Since sentenced inmates
may be held under conditions that are punitive, while pretrial
inmates my not be, the courts have said that the due process
clause affords greater protection to unsentenced inmates than the
Eighth Amendment affords to the convicted.")).

apply to a prison's administration of medical care, including mental health care. See DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991); Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (recognizing deliberate indifference to an inmate's mental health needs violates the Eighth Amendment).

"[A]dequate medical care" is treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations. United States v. DeCologero, 821 F.2d 39, 42-43 (1st Cir. 1987). This does not mean that an inmate is entitled to the care of his or her choice, simply that the care must meet minimal standards of adequacy. Deliberate indifference may be found where the medical care provided is "so clearly inadequate as to amount to a refusal to provide essential care." Torraco, 923 F.2d at 234. Constraints inherent in a prison setting may affect the choice of care provided, and may be relevant to whether or not prison officials provided inadequate care with a deliberately indifferent mental state. Wilson v. Seiter, 501 U.S. 294, 302 (1991).

Here, Proverb has alleged that he was not seen by mental health professionals as often as he would have liked, and that he was not satisfied with Dr. Harris' diagnoses or the quality of the care he received from Dr. Harris. Proverb has failed to allege, however, that he was denied minimally adequate mental health care, only the denial of the care of his choice. Proverb was evaluated and seen regularly by at least two mental health workers, and was placed on suicide watch to protect him when HCDOC officials had reason to believe that he might harm himself. Further, he has failed to show that any official at the HCDOC was aware of, and disregarded, a serious threat to Proverb's mental health. Absent that, Proverb cannot make out a constitutional violation for the denial of mental health care. Accordingly, I recommend that this claim be dismissed from this action.

X.  Denial of Access to Grievance Procedures Claims

Throughout his complaint, Proverb makes reference to a number of occasions when his grievance forms were thrown out, or when he was persuaded or coerced in some manner to recant or withdraw a grievance he had filed. While some of the withdrawn grievance forms submitted with the complaint reflect that, after conversation with the involved officers, Proverb came to realize

57

that he had either overreacted to or overanalyzed a situation,
Proverb names a number of other times when the circumstances
surrounding the withdrawal of the grievances were less clear.
For example, Proverb states that he was given clean laundry on
the condition that he withdraw his laundry-related grievance,
that he was threatened by Riley to withdraw his grievance
regarding Antillis forcing him to state "I love black people,"
and that his grievance regarding the foul smelling inmate on his
unit was thrown into the trash in his presence. Further, a
number of the "withdrawn" grievance forms made their way to the
HCDOC Superintendent's office anyway. That office would then
rule that no action on its part was required as the grievance had
been withdrawn.

While there is no constitutional right to the existence of
grievance procedures, see Lim v. Stanley, 2005 WL 1712202, *4
n.13 (D.N.H. 2005), the right to the use of established
administrative grievance procedures in a prison context is
protected by the constitutional right to petition the government
for a redress of grievances. See Hudson v. Palmer, 468 U.S. 517,
523 (1984); Sprouse v. Babcock, 870 F.2d 450, 452 (8th cir.
1989); Franco v. Kelly, 854 F.2d 584, 589-90 (2d Cir. 1988). I

find that Proverb's complaint alleges claims for a denial of
access to established HCDOC grievance procedures by Riley,
Barnes, Potter, and O'Mara, as his office reviewed the grievances
and was aware that they were being withdrawn after staff
conversed with Proverb. In my Simultaneous Order, I will direct
service of this claim against these defendants.[14]

## XI. Excessive Strip Search Claim

Proverb claims that while on suicide watch, he was strip
searched in excess of three times a day, despite the fact that he
was in an observation cell, and therefore had no contact with
other inmates, minimal, if any, opportunity to conceal anything
under his safety smock because he was in an observation cell, and
that even when he was out of his cell, he was close to and within
sight of a corrections officer at all times. Proverb asserts
that, therefore, the strip searches were excessive and
unreasonable.

---

[14]By allowing this claim to proceed, I express no opinion
about whether or not the grievance procedures provided will
ultimately prove to have been denied to Proverb to an extent that
renders them "unavailable" for purposes of absolving Proverb from
any exhaustion requirements that accrue under the Prison
Litigation Reform Act, 42 U.S.C. § 1997e(a) (proper exhaustion of
administrative remedies in only of those remedies "as are
available"); see Macias v. Zenk, 495 F.3d 37, 44-45 (2d Cir.
2007) (remedies may not be "available" to prisoner threatened by
prison employee).

Regarding strip searches, pretrial detainees retain certain
constitutional rights during their incarceration, including their
Fourth Amendment right against unreasonable searches. Bell, 441
U.S. at 545. "However, those rights may be subject to
restrictions based on the fact of confinement, the legitimate
goals and policies of the penal institution, and the need of the
institution to maintain security and internal order." Roberts v.
Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001); Bell, 442 U.S.
at 545-46. In Bell, the Court instructed courts examining prison
strip searches to "consider the scope of the particular
intrusion, the manner in which it is conducted, the justification
for initiating it, and the place in which it is conducted." 441
U.S. at 559. This Circuit has held that in the context of
prisoners held in local jails for minor offenses, "the Bell
balance requires officers to have a reasonable suspicion that a
particular detainee harbors contraband prior to conducting a
strip or visual body cavity search." Roberts, 239 F.3d at 110,
(citing Swain v. Spinney, 117 F.3d 1, 5 (1st Cir. 1997)).

Because Proverb was required to entirely undress several
times a day, the searches constituted a significant intrusion
worthy of scrutiny. Applying the Bell balancing factors in the

60

present case, I find that although he was not detained at the HCDOC on a minor offense, but on a felony, it was not the type of felony which would ordinarily warrant out-of-the-ordinary suspicion that an inmate might be inclined to possess contraband, such as would be the case if an inmate had committed a drug or an alcohol-related offense, or a crime involving a weapon. Further, while on suicide watch, Proverb was, presumably, entirely segregated from other inmates, eliminating the risk that he would receive contraband from someone inside the HCDOC. Except on two occasions, where Proverb alleges that he was beaten while naked during a strip search,[15] Proverb does not allege any facts regarding the manner in which the actual searches were conducted on a daily basis. The complaint alleges that the strip searches were conducted either to harass Proverb, or pursuant to a general prison policy. In neither case does the complaint allege any facts that indicate that the searches were based on any particularized suspicion that Proverb was harboring some contraband on his person or in his safety smock.

---

[15]I find that these incidents are more properly framed as claims alleging excessive force, rather than claims related to the strip search itself, which served, in those instances, only as a context in which the alleged assaultive behavior occurred.

61

I find that the facts alleged regarding the number of strip searches conducted while Proverb was on suicide watch is sufficient to state a claim that such searches were excessive, and therefore unreasonable, in violation of the Fourth Amendment. To the extent that Proverb claims that the strip searches were conducted pursuant to an HCDOC policy that does not rely on particularized suspicion in conducting strip searches of pretrial detainees, therefore, I find that this action can proceed against O'Mara, who, as Superintendent of the HCDOC, would be the individual responsible for the ensuring the constitutionality of strip searches conducted at that facility.

XII. Denial of Right of Access to the Courts Claims

As previously noted, inmates are not entitled to all of the constitutional rights guaranteed to nonincarcerated people. Prisoners do, however, maintain a constitutional right of access to the courts that affords them access to the tools necessary to challenge their criminal cases, criminal convictions and sentences directly or collaterally, to file habeas petitions, or to challenge the conditions of their confinement through civil rights actions. Lewis v. Casey, 518 U.S. 343, 345 (1996). In order to state a claim for denial of access to the courts under §

62

1983, a prisoner must demonstrate that the prison officials'
actions "hindered his efforts to pursue a legal claim" that he is
constitutionally entitled to pursue during his incarceration.
Id. at 351.

Here, Proverb claims that he was hindered in his legal
research by the presence of educational classes in the law
library during his law library time.  Proverb also claims that he
was, at times, denied the ability to contact his attorney by
phone during business hours.  Proverb never states, however, that
any civil or criminal action that he was constitutionally
entitled to pursue was hindered by either of these circumstances.
Proverb has failed, therefore, to allege that he was deprived of
his right to meaningfully access the courts.  See id.
Accordingly, I recommend that the claim be dismissed from this
action.

## XIII. False Disciplinary Report Claims

Proverb claims that Moloney violated his right to due
process by intentionally filing a false disciplinary report
against Proverb, claiming that he had incited a riot,
disrespected a staff person, and disobeyed an officer.  Proverb

63

states that Moloney made the charges up in an attempt to have Proverb transferred to Unit 2B, the maximum security unit.

At the disciplinary hearing held in the matter, Proverb pleaded guilty to being disrespectful to Moloney, not the female staff member he was charged with disrespecting, and received a minimal sanction -- loss of two hours of out-of-cell time. Proverb's claim attempts to allege that Moloney intended to deprive him of a liberty interest by having him transferred to Unit 2B on the basis of a false disciplinary report. Proverb claims this was Moloney's attempt to subject him to punishment without a legitimate penological reason.

Proverb, however, was afforded a due process hearing on the disciplinary charges, at which he was given the opportunity to plead guilty to an infraction he admits that he committed, for which he was given a very reasonable sanction. The sanction was not intended, and did not serve, to punish him for his underlying criminal charge, but was a reasonable administrative response to a violation of the rules of the institution. Accordingly, I cannot construe any constitutional claim arising out of these allegations, and I recommend that the false disciplinary report claim be dismissed.

64

## XIV. Equal Protection Claim

Proverb has alleged generally, throughout his complaint, that his Fifth Amendment right to the equal protection of the laws has been violated. Proverb is not specific as to what acts by what defendants he claims denied him his equal protection. Accordingly, I recommend that this claim be dismissed as inadequately alleged.

## XV. Named Defendants

Proverb has named the following defendants to this action against whom no actionable claim appears to lie: Scurry, Duclose, Cusson, Ives, Hisco, Raymond, Christine LNU, Barber, Harris, Rodgers, Gosslin, Thomas, Sloane, Utzilano, Brown, Bowers, Goldmann, Bass, and Jan LNU. I therefore recommend that these defendants be dismissed from this action.

## Conclusion

For the foregoing reasons, I recommend dismissal of the following claims from this action: (1) deprivation of the free exercise of religion; (2) inadequate conditions of confinement concerning: (a) missing linens; (b) denial of personal care items and showers; (c) inadequate cell size; (d) a water leak in Proverb's cell; (e) deprivation of natural light; (f) unsanitary

65

food service; (g) excessive noise and light on Proverb's housing
unit; (h) subjection to twenty-two hour daily lockdown; (i)
failure to create a separate housing unit to enable Proverb to
have the same privileges as general population inmates; (j)
denial of exercise; (k) denial of fresh air; (l) improper
lockdown incidents wtih Marinowski and Duclose; (m) failure to
remedy a noxious odor on the housing unit; (3) denial of the
right to a fair trial; (4) denial of access to the courts; (5)
denial of due process by the creation of a false disciplinary
report; and (6) denial of equal protection.  I also recommend
that defendants Scurry, Duclose, Cusson, Ives, Hisco, Raymond,
Christine LNU, Barber, Harris, Rodgers, Gosslin, Thomas, Sloane,
Utzilano, Brown, Bowers, Goldmann, Bass and Jan LNU be dismissed
from this action.  In my Simultaneous Order, I will direct
service of the remaining claims on the appropriate defendants
that remain in this action.

Any objections to this report and recommendation must be
filed within ten (10) days of receipt of this notice.  Failure to
file objections within the specified time waives the right to
appeal the district court's order.  See Unauthorized Practice of

<u>Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992);

<u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

Justo Arenas
United States Magistrate Judge

Date:       February 13, 2009

cc:         David R. Proverb, pro se

67